# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JENNIFER D. KENDRICK,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00037 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

### *I. Background and Standard of Review*

Plaintiff, Jennifer D. Kendrick, ("Kendrick"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kendrick protectively filed her application for DIB on July 6, 2018, alleging disability as of June 10, 2018, based on muscle and bone pain; fatigue; chest pain; depression; anxiety; difficulty concentrating and focusing; acid reflux; swelling in legs and hands; and neck and back problems. (Record, ("R."), at 15, 213-14, 242, 302.) The claim was denied initially and upon reconsideration. (R. at 144-46, 150-52, 155-58, 160-62.) Kendrick then requested a hearing before an administrative law judge, ("ALJ"). (R. at 163-64.) The ALJ held a hearing on April 14, 2020, at which Kendrick was represented by counsel. (R. at 69-106.)

By decision dated April 23, 2020, the ALJ denied Kendrick's claim. (R. at 15-35.) The ALJ found Kendrick met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2023. (R. at 17.) The ALJ found Kendrick had not engaged in substantial gainful activity since June 10, 2018,[2] the alleged onset date. (R. at 17.) The ALJ determined Kendrick had severe impairments, namely cervical and lumbar degenerative disc disease; right carpal tunnel syndrome; anxiety; depression; and fibromyalgia, but he found Kendrick did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[2] Therefore, Kendrick must show she was disabled between June 10, 2018, the alleged onset date, and April 23, 2020, the date of the ALJ's decision, to be eligible for benefits.

(R. at 18.) The ALJ found Kendrick had the residual functional capacity to perform light work[3] that did not require more than frequent overhead reaching and frequent handling with the right hand; that did not require more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; that did not require more than occasional exposure to unprotected heights, hazardous machinery, extreme cold or vibrations; that required the performance of no more than simple, routine tasks with only simple, short instructions, simple decisions and occasional workplace changes; that did not require more than occasional, superficial[4] interactions with co-workers and the public; and that required only occasional interaction with supervisors. (R. at 21.) The ALJ found Kendrick was unable to perform any of her past work. (R. at 33.) Based on Kendrick's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Kendrick could perform, including the job of a bagger. (R. at 33-34.) Thus, the ALJ concluded Kendrick was not under a disability as defined by the Act from June 10, 2018, through the date of the decision, and she was not eligible for DIB benefits. (R. at 34-35.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Kendrick pursued her administrative appeals, (R. at 325-27), but the Appeals Council denied her request for review. (R. at 1-5.) Kendrick then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Kendrick's motion for summary

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

[4] The ALJ defined superficial as performing such tasks as telling the time of day or providing directions to the bathroom. (R. at 21, 99.)

judgment filed May 27, 2021, and the Commissioner's motion for summary judgment filed June 11, 2021.

## II. Facts

Kendrick was born in 1972, (R. at 213), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Kendrick has some college education and past work experience as a correction officer and a jailer. (R. at 75-76, 78, 97, 243.) She testified that, when she was employed, she missed three to five workdays a month due to anxiety and pain. (R. at 86.) Kendrick stated she was traumatized after her sergeant committed suicide in the parking lot at work. (R. at 90.) She stated she experienced numbness in her upper extremities, which was worse on the right. (R. at 94-95.) Kendrick stated she attended church and her son's sporting events. (R. at 268.)

Rick Bradley, a vocational expert, also was present and testified at Kendrick's hearing. (R. at 96-104.) Bradley was asked to consider a hypothetical individual of Kendrick's age, education and work history, who could perform light work that did not require more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; that did not require more than occasional exposure to unprotected heights, hazardous machinery, extreme cold or vibrations; that required the performance of no more than simple, routine tasks with only simple, short instructions, simple decisions and occasional workplace changes; and that required no more than occasional interaction with supervisors, co-workers and the public. (R. at 97.) He stated the hypothetical individual could not perform Kendrick's past work, but a significant number of other jobs existed that such an individual could perform,

including jobs as a resale marker, a garment folder and an addressing clerk.[5] (R. at 97-98.)

Next, Bradley was asked to consider a second hypothetical individual who could perform simple, routine, light work that required no more than frequent, bilateral overhead reaching and only frequent handling with the right hand; that required no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; that required only occasional work at unprotected heights, around hazardous machinery, extreme cold temperatures and vibrations; that required the performance of no more than simple, short instructions with simple decisions and only occasional work-related changes; that did not require more than occasional superficial interaction with co-workers and the public; and that required only occasional interaction with supervisors. (R. at 98-99.) He stated the hypothetical individual could not perform Kendrick's past work, but a significant number of other jobs existed that such an individual could perform, including the previously identified job of an addressing clerk, as well as the jobs of an assembler[6] and a bagger. (R. at 99-100.) He stated there would be no jobs available should the hypothetical individual be off task 15 percent of the workday and be absent from work two days a month. (R. at 101.)

---

[5] The job of addressing clerk was identified as a sedentary job. (R. at 98.) Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

[6] The job of assembler was identified as a sedentary job. (R. at 100.)

Bradley was then asked to consider the first hypothetical individual, but who did not have the ability to use her hands and arms for feeling, handling and gross and fine manipulation, and who could only occasionally reach in all directions. (R. at 101.) He stated the jobs previously mentioned would be eliminated. (R. at 101.) He stated there would be no jobs available should the individual be limited as found in family nurse practitioner, Jessica Rasnick's September 27, 2019, assessment, and in licensed clinical psychologist Melinda Fields's November 14, 2019, assessment. (R. at 102-03, 1180-82, 1239-41.)

In rendering his decision, the ALJ reviewed records from Dr. Bert Spetzler, M.D., a state agency physician; Stephanie Fearer, Ph.D., a state agency psychologist; Jo McClain, Psy.D., a state agency psychologist; Dr. William Rutherford, Jr., M.D., a state agency physician; Holston Valley Medical Center, ("Holston Valley"); Mountain View Regional Medical Center, ("Mountain View"); Dickenson Community Hospital; Dominion Health & Fitness; Dickenson Medical Clinic; Counseling Associates of Abingdon, ("Counseling Associates"); Pikeville Medical Center; Wellmont Cardiology Services; Mountain Comprehensive Care Center; Associated Neurologists of Kingsport; and Melinda M. Fields, Ph.D., a licensed psychologist.

On April 10, 2017, an MRI of Kendrick's lumbar spine showed small disc bulges and protrusions at the L3-L4 and L5-S1 levels. (R. at 457.)

From June 2017 through August 2018, Kendrick participated in counseling at Counseling Associates of Abingdon. (R. at 329-31, 664-71.) On June 27, 2017, Kathryn D. Hannah, L.P.C., a licensed professional counselor, diagnosed Kendrick with generalized anxiety disorder. (R. at 331.) During 2017, Hannah reported

Kendrick's appearance, behavior, thought process, concentration, affect and speech were within normal limits, and her mood was anxious. (R. at 330, 667-71.) In 2018, Hannah reported Kendrick's appearance, thought process, concentration, affect and speech were within normal limits, and her mood was depressed and anxious. (R. at 665-66.)

On February 26, 2018, Kendrick presented to the emergency department at Holston Valley for complaints of chest pain. (R. at 366-451.) Kendrick described a significant amount of work-related stress and anxiety. (R. at 372.) She denied weakness in her upper and lower extremities, behavior problems and confusion. (R. at 372-73.) Kendrick had some chest wall tenderness to palpation; she had normal range of motion of her neck and musculoskeletal system; and she had normal mood, affect and behavior. (R. at 374.) An electrocardiogram, ("ECG"), was normal. (R. at 387, 450.) Chest x-rays showed minimal thoracic scoliosis and mild arthritic abnormalities of the first costochondral joints. (R. at 387.) Kendrick was diagnosed with unspecified chest pain. (R. at 367.)

Kendrick treated with Leslie Davis, N.P.-C., a certified nurse practitioner with the Dickenson Medical Clinic, from February 2018 through August 2018 for complaints of anxiety, which she related to increased work stress; left hip and knee pain; tension and pain in her neck and shoulders; low back pain; and fatigue. (R. at 604-23.) During this time, Davis placed Kendrick out of work briefly due to her complaints of increased work stress and harassment. (R. at 607, 609, 611, 623, 648, 650.) On March 14, 2018, x-rays of Kendrick's hips showed multiple pelvic calcifications. (R. at 468.) On March 21, 2018, ankle-brachial indices and a bilateral lower extremity arterial duplex doppler ultrasound were normal. (R. at 470.) On March 28, 2018, a x-rays of Kendrick's lumbar spine showed small anterior

extradural defects at the L3-L4 and L5-S1 levels. (R. at 490.) A lumbar myelogram showed small anterior extradural defects at the L3-L4 and L4-L5 levels. (R. at 490.) A CT scan of Kendrick's lumbar spine showed small, stable disc protrusions and bulges at the L3-L4 and L5-S1 levels. (R. at 495.) On May 25, 2018, x-rays of Kendrick's left knee were normal. (R. at 565.) X-rays of Kendrick's left hip were normal. (R. at 566.) X-rays of Kendrick's cervical spine showed mild mid cervical spondylosis with reversal of the normal cervical lordosis and disc space narrowing at the C5-6 and C6-7 spaces with small osteophytes. (R. at 567.) On July 3, 2018, an MRI of Kendrick's cervical spine showed mild, bilateral foraminal narrowing due to degenerative disc changes at the C4-5, C5-6, C6-7 and C7-T1 disc spaces. (R. at 512.) On November 19, 2018, an MRI of Kendrick's brain was normal. (R. at 682-83.)

Throughout 2018, Davis reported Kendrick had tenderness at her cervical spine and surrounding muscles, with spasms felt in the bilateral trapezius muscles; she had left hip and knee tenderness; she had a normal gait; she had no edema, erythema or deformity; her mood was depressed; and she had good insight, thought content and judgment. (R. at 605, 607, 609-11, 614-16, 618, 620, 648-49, 652, 654, 691, 693, 695.) Kendrick regularly reported medication and counseling were helping her anxiety. (R. at 604, 606, 608, 618, 620, 622, 653, 694.) Kendrick also reported physical therapy[7] was helping. (R. at 604.)

On August 8, 2018, Kendrick saw Hannah for counseling and reported she had seen a chiropractor, which "did wonders." (R. at 664.) She stated it also helped

---

[7] Kendrick participated in physical therapy at Dominion Health & Fitness from July through August 2018 for cervical pain. (R. at 583-96, 811-18.)

her "mind clear up." (R. at 664.) Hannah reported Kendrick's appearance and concentration were within normal limits. (R. at 664.)

On September 19, 2018, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding Kendrick could perform light work. (R. at 114-16.) He found Kendrick had an unlimited ability to balance, but she could occasionally climb, stoop, kneel, crouch and crawl. (R. at 114-15.) Dr. Spetzler opined Kendrick should avoid concentrated exposure to extreme cold, vibrations and hazards, such as machinery and heights. (R. at 115.) Dr. Spetzler found Kendrick had no manipulative, visual or communicative limitations. (R. at 115.)

On September 19, 2018, Stephanie Fearer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating Kendrick suffered from severe anxiety and obsessive-compulsive disorders. (R. at 111-12.) She opined Kendrick had mild limitations in her ability to understand, remember or apply information and moderate limitations in her ability to interact with others, to concentrate, persist or maintain pace and to adapt and manage herself. (R. at 112.)

That same day, Fearer also completed a mental assessment, indicating Kendrick had moderate limitations[8] in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent

---

[8] The regulations define a moderate limitation as "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2020.)

pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 116-18.) Fearer stated Kendrick's work-related mental abilities were, otherwise, not significantly limited. (R. at 116-18.) Fearer stated Kendrick would be limited to simple, routine work with limited contact with the public. (R. at 118.)

On October 19, 2018, Kendrick was seen by Angela Dameron, L.C.S.W., a licensed clinical social worker at the Mountain Comprehensive Care Center, upon Davis's referral. (R. at 989-97.) Kendrick reported depression and anxiety and stated she had suffered from depression since childhood. (R. at 989-90.) She reported her symptoms were worsened by work and health-related stressors. (R. at 991.) Dameron reported Kendrick had normal posture and body movements; her speech was clear; she was cooperative; she made fair eye contact; she had a euthymic mood; she had normal thought content; and her memory, judgment and insight were normal. (R. at 995-96.) Dameron diagnosed major depressive disorder, severe, recurrent, and generalized anxiety disorder. (R. at 996.)

On November 14, 2018, Hannah completed a mental evaluation form, indicating she treated Kendrick from June 2017 through August 2018 for post-traumatic stress disorder, ("PTSD"), and generalized anxiety disorder. (R. at 659-63.) Hannah reported Kendrick was able to perform self-care independently, but she had a "dread" of work and social events. (R. at 660.) Kendrick's attitude, behavior and appearance were appropriate; she had an anxious mood and affect; her memory

was "foggy;" she had negative thoughts and focus; her attention span, concentration, persistence and task completion were appropriate; her ability to perform calculations and abstract reasoning was appropriate; her judgment was "o.k.;" her fund of information was good; and she needed coping skills for stressful situations. (R. at 661-62.)

On November 16, 2018, Kendrick was seen by Dr. Maryam Khawari, M.D., a physician with Pikeville Medical Center, for complaints of bilateral shoulder, left hip and knee, low back and neck pain. (R. at 672.) Dr. Khawari reported Kendrick was tearful and crying over personal and work-related stressors, which made it difficult for her to communicate. (R. at 672.) Kendrick's musculoskeletal examination was normal; her mood and affect were appropriate; and she had normal insight and judgment. (R. at 675-76.) Dr. Khawari diagnosed polyarthritis; severe anxiety and depression, situational and circumstantial; and polyarthralgia and pain related to psychosomatic disorder. (R. at 676.)

On January 14, 2019, Davis completed a medical assessment, indicating Kendrick could lift and carry items weighing 15 pounds occasionally and five pounds frequently; she could stand and/or walk a total of four hours in an eight-hour workday, and she could do so for up to one hour without interruption; she had no restriction on her sitting ability; she could occasionally stoop, kneel, balance, crouch and crawl and never climb; and she had a limited ability to reach, to handle and to push/pull. (R. at 1154-56.) Davis opined Kendrick would be absent from work about two days a month. (R. at 1156.)

On January 25, 2019, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF, indicating Kendrick suffered from severe anxiety and obsessive-

compulsive disorders. (R. at 129.) She opined Kendrick had mild limitations in her ability to understand, remember or apply information and moderate limitations in her ability to interact with others, to concentrate, persist or maintain pace and to adapt and manage herself. (R. at 129.)

That same day, McClain also completed a mental assessment, indicating Kendrick had moderate limitations in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 133-35.) McClain stated Kendrick's work-related mental abilities were, otherwise, not significantly limited. (R. at 133-35.) McClain stated Kendrick would be limited to simple, routine work with limited contact with the public. (R. at 135.)

On January 25, 2019, Dr. William Rutherford, Jr., M.D., a state agency physician, completed a medical assessment, finding Kendrick could perform light work. (R. at 131-33.) He found Kendrick had an unlimited ability to balance, but she could occasionally climb, stoop, kneel, crouch and crawl. (R. at 131-32.) Dr. Rutherford opined Kendrick should avoid concentrated exposure to extreme cold, vibrations and hazards, such as machinery and heights. (R. at 132.) Dr. Rutherford

found Kendrick had no manipulative, visual or communicative limitations. (R. at 132.)

Kendrick treated with Jessica Rasnick, L.N.P., a licensed nurse practitioner with the Dickenson Medical Clinic, from February 2019 through February 2020 for complaints of left hip and knee pain; tension and pain in her neck and shoulders; low back pain; right shoulder and hip pain; and numbness in both hands, legs and arms. (R. at 1115-20, 1130-33, 1286-93.) Examinations showed Kendrick had tenderness at her cervical spine and surrounding muscles, with spasms felt in the bilateral trapezius muscles; she had right shoulder tenderness; she had a normal gait; she had no edema, erythema or deformity; she had a negative Tinel's sign and Phalen's sign; she did not appear depressed or anxious; and she had good insight, thought content and judgment. (R. at 1116-17, 1131.) Kendrick reported medication and counseling were helping her symptoms of depression and anxiety. (R. at 1115, 1117, 1130.) Kendrick also reported physical therapy and acupuncture were helping. (R. at 1117, 1130.)

On March 14, 2019, Kendrick saw Priscilla Mullins, A.P.R.N., a psychiatric mental health nurse with the Mountain Comprehensive Care Center, and reported Zoloft made a "big difference in my anger." [I] don't curse now. I smile and laugh more." (R. at 1021.) Mullins reported Kendrick had normal muscle strength and tone; her coordination and gait were normal; she had no cognitive impairments; and her mood was depressed. (R. at 1022.)

On April 18, 2019, Kendrick saw Amy Galloway, F.N.P., a family nurse practitioner with Holston Medical Group, for complaints of right shoulder pain and right arm numbness. (R. at 969.) Kendrick's mood and affect were normal; she had

no deformity to her neck or right arm; she had pain over her deltoid with right arm flexion with an empty can test; she raised her right arm past shoulder level; she was able to place her arm behind her back; her arm strength was equal, bilaterally, and strong; she had a strong radial pulse; and she had pain across the top of her shoulder when looking to the left and when she lowered her head. (R. at 970.) She was diagnosed with trapezius pain and chronic neck pain. (R. at 971.)

On May 15, 2019, Kendrick was seen at Wellmont Medical Associates for right shoulder pain and numbness in the bilateral fingers. (R. at 1062.) She also complained of bilateral upper extremity weakness, but none was noted on examination. (R. at 1062.) Kendrick reported acupuncture was providing "some benefits." (R. at 1062.) Kendrick had tenderness and pain in her cervical back; she had pain in her lumbar back; she had normal range of motion; she had normal muscle strength, bulk and tone; she had a normal gait; she had normal sensation; she had 1+ reflexes, bilaterally; her straight leg raising tests were negative; and her mood, affect, behavior, judgment and thought content were normal. (R. at 1067-69.) She was referred for an electromyography, ("EMG"), nerve conduction study[9] and trigger point injections.[10] (R. at 1062.)

On May 16, 2019, Kendrick saw Mullins and reported some improvement with anxiety, but she continued to be preoccupied with her past employment. (R. at 1041.) Mullins reported Kendrick was well-groomed; she had normal muscle strength and tone; her coordination and gait were normal; she made good eye

---

[9] On July 1, 2019, an EMG and nerve conduction study showed right median nerve compression at the wrist consistent with carpal tunnel syndrome of mild grade with sensory latency prolongation. (R. at 1047-53.)

[10] On June 9, 2019, Kendrick had bilateral trigger point injections. (R. at 1055-58.)

contact; she was talkative, and her speech was coherent; she had no cognitive impairments or perceptual disturbances; and her mood was anxious with a congruent affect. (R. at 1042.)

On July 15, 2019, Mullins reported Kendrick was well-groomed; she had normal muscle strength and tone; her coordination and gait were normal; she made good eye contact; she had no speech abnormalities; she had no cognitive impairments; she had no perceptional disturbances; and her mood was anxious with a congruent affect. (R. at 1201.)

On August 5, 2019, Dr. Michael S. Dew, M.D., a physician with Associated Neurologists of Kingsport, examined Kendrick for her complaints of right hand and arm numbness; weakness; muscle cramps and pain; joint pain; and back and neck pain. (R. at 1157.) She denied tremor and stiffness. (R. at 1158.) Kendrick's mood and affect were normal; she had normal memory, attention span and concentration; her speech was clear; she had tenderness over her right bicep tendon, but normal bulk and tone; she had full strength throughout; she had decreased temperature in the right foot; she had decreased sensation in the right hand and foot; she had a normal station and gait; and her reflexes were symmetric. (R. at 1159-60.) Dr. Dew diagnosed paresthesia of the skin; right shoulder pain; fatigue; and migraine with aura, not intractable, without status migrainosus. (R. at 1160.) Dr. Dew recommended conservative treatment.[11] (R. at 1161.)

---

[11] Kendrick participated in physical therapy at Dominion Health & Fitness from August through November 2019 for neck and right shoulder pain. (R. at 1098-1108, 1183-99.) It was noted that Kendrick had tenderness in the lower trapezius and paraspinal regions with trigger points noted and a right rotator cuff attachment tenderness with sharp pain. (R. at 1185.) Evaluation showed decreased functional status, including decreased range of motion and strength. (R. at 1185.)

On September 12, 2019, Kendrick saw Dr. Khawari and reported neck and back pain. (R. at 1167.) She reported her symptoms of depression and anxiety had improved with medication. (R. at 1167.) Kendrick had soft tissue discomfort in the posterior neck, bilateral shoulders, chest, back, left elbow, thighs and knees; thus, she had 16 out of 18 trigger points. (R. at 1171.) Kendrick's memory was normal, and she had an appropriate mood and affect. (R. at 1171.) Dr. Khawari diagnosed fibromyalgia, anxiety and depression. (R. at 1171.)

On September 27, 2019, Rasnick completed a medical assessment, indicating Kendrick could occasionally and frequently lift and carry items weighing up to five pounds; she could stand and/or walk a total of three hours in an eight-hour workday, and she could do so for up to 30 minutes without interruption; she could sit five hours in an eight-hour workday, but could do so for up to 30 minutes without interruption; she could occasionally climb, stoop, kneel, balance, crouch and crawl; and she had a limited ability to reach, to handle and to push/pull. (R. at 1239-41.) Rasnick opined Kendrick was restricted from working around temperature extremes, noise, humidity and vibration. (R. at 1241.) She opined Kendrick would be absent from work more than two days a month. (R. at 1241.)

On October 9, 2019, Kendrick saw Mullins and reported Zoloft worked "really well." (R. at 1204.) She reported she enjoyed riding motorcycles and spending time with her family. (R. at 1204.) Mullins reported Kendrick was well-groomed; she had normal muscle strength and tone; her coordination and gait were normal; she made good eye contact; she was talkative, but her speech was coherent; she had no cognitive impairments or perceptual disturbances; and her mood was anxious with a congruent affect. (R. at 1205.)

On November 14, 2019, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Kendrick. (R. at 1173-79.) Kendrick reported "journaling;" reading; watching television; attending church weekly; and teaching an adolescent Sunday school class. (R. at 1176.) Kendrick had adequate hygiene and grooming; she was pleasant and cooperative; she made adequate eye contact; her mood was anxious, and she displayed hand tremors; she had a congruent affect; her stream of thought was disorganized; she displayed no evidence of thought content impairment; her judgment was impaired; her immediate memory was within normal limits; her recent recall was impaired; and her pace and posture were within normal limits. (R. at 1176-77.) The Beck Depression Inventory, ("BDI"), and the Beck Anxiety Inventory, ("BAI"), were indicative of significant depressive and anxiety-related symptomatology. (R. at 1178.) Fields diagnosed generalized anxiety disorder; panic disorder; and major depressive disorder. (R. at 1178.) Fields also noted post-traumatic stress symptoms and histrionic and narcissistic personality disorder traits. (R. at 1178.)

That same day, Fields completed a mental assessment, indicating Kendrick had no limitation in her ability to maintain personal appearance. (R. at 1180-82.) She opined Kendrick had a satisfactory ability to follow work rules; to function independently; to understand, remember and carry out simple job instructions; and to demonstrate reliability. (R. at 1180-81.) Fields found Kendrick had a seriously limited ability to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out detailed and complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 1180-81.) Fields also found Kendrick would be absent from work more than two days a month. (R. at 1182.)

On November 25, 2019, Kendrick saw Mullins and reported financial stressors. (R. at 1208.) Kendrick stated she was trying to be more active by helping her neighbors with their transportation needs. (R. at 1208.) Mullins reported Kendrick was well groomed; she had normal muscle strength and tone; her coordination and gait were normal; she made good eye contact; her speech was coherent and rapid, and she needed interruption; she had no cognitive impairments or perceptional disturbances; and her mood was anxious with a congruent affect. (R. at 1209.)

On January 9, 2020, Kendrick saw Rasnick and reported right shoulder and hip pain. (R at 1291.) Rasnick reported Kendrick had tenderness at her cervical spine and surrounding muscles with spasms felt in the bilateral trapezius muscles; she had mild tenderness in the right shoulder; she had mild pain with range of motion; she had full range of motion of the right hip with no tenderness; she had no edema, erythema or deformity; she did not appear depressed or anxious; and she had good insight, thought content and judgment. (R. at 1292.) On February 26, 2020, Kendrick complained of low back pain that radiated into her right buttock and groin area. (R. at 1286.) Kendrick had tenderness at the lumbar spine and surrounding muscles; she had tenderness to pinpoint areas of the right buttock; she had no edema, erythema or deformity; and she had no apparent neurological deficits. (R. at 1281.) X-rays of Kendrick's right hip and right shoulder were normal. (R. at 1287, 1295-96.) X-rays of Kendrick's lumbar spine showed minimal spondylosis. (R. at 1294.) Rasnick diagnosed right side sciatica.[12] (R. at 1287.)

---

[12] Kendrick participated in physical therapy in March 2020 for her complaints of lumbar pain. (R. at 1311-20.)

On February 18, 2020, Kendrick saw Mullins and reported grief and family stressors. (R. at 1298.) Mullins reported Kendrick was well-groomed; she had normal muscle strength and tone; her coordination and gait were normal; she made good eye contact; her speech was coherent, but she needed interruption; she had attention, concentration and insight issues; she had no perceptional disturbances; and her mood was anxious and irritable with a congruent affect. (R. at 1299.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715

F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Kendrick argues the ALJ erred by improperly determining her residual functional capacity by failing to properly consider the opinions of Davis, Rasnick and Fields. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Kendrick argues the ALJ erred by finding a substantial number of jobs existed that she could perform. (Plaintiff's Brief at 7.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign

an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[13]

Instead, an ALJ must consider and articulate how *persuasive* he finds all of the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[14] In

---

[13] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

[14] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to

evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict

---

Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

The ALJ found Kendrick had the residual functional capacity to perform light work that did not require more than frequent overhead reaching and frequent handling with the right hand; that did not require more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; that did not require more than occasional exposure to unprotected heights, hazardous machinery, extreme cold or vibrations; that required the performance of no more than simple, routine tasks with only simple, short instructions, simple decisions and occasional workplace changes; that did not require more than occasional, superficial interactions with co-workers and the public; and that required only occasional interaction with supervisors. (R. at 21.) A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a) (2020).

In making his residual functional capacity finding, the ALJ stated he found the opinions of Davis, Rasnick and Fields "not persuasive" and "inconsistent." (R. at 30-33.) The ALJ found Davis's January 2019 assessment "not persuasive" and "not consistent," as it was not supported by her own records, which failed to show great abnormalities during examinations. (R. at 30-31.) In addition, the ALJ found Rasnick's September 2019 assessment "not persuasive." (R. at 31.) Davis and Rasnick opined Kendrick was limited in her ability to lift, to reach, to handle and to push/pull. (R. at 1154-56, 1239-41.) Davis's examinations showed Kendrick had tenderness at her cervical spine and surrounding muscles, with spasms felt in the bilateral trapezius muscles; she had left hip and knee tenderness; she had a normal gait; and she had no edema, erythema or deformity. (R. at 605, 607, 609-11, 614-16, 652, 654, 691, 693, 695.) Rasnick's examinations showed Kendrick had tenderness

at her cervical spine and surrounding muscles, with spasms felt in the bilateral trapezius muscles; she had right shoulder tenderness; she had a normal gait; she had no edema, erythema or deformity; and her Tinel's and Phalen's sign were negative. (R. at 1116-17, 1131, 1292.) An MRI and x-rays of Kendrick's cervical spine showed mild cervical spondylosis and mild bilateral foraminal narrowing due to degenerative changes, and x-rays of Kendrick's lumbar spine showed minimal spondylosis. (R. at 512, 567, 1294.) While Kendrick had mild tenderness in her right arm and shoulder, muscle spasms in her bilateral trapezius muscles and mild pain with range of motion, she was able to raise her right arm past shoulder level and place her arm behind her back. (R. at 970, 1116, 1131, 1159-60, 1292.) In addition, the record routinely shows Kendrick had normal posture and body movements and normal musculoskeletal examinations, including having normal muscle strength, tone, gait and coordination. (R. at 675, 995, 1022, 1042, 1067-69, 1160, 1201, 1205, 1209, 1299.) In February 2020, Kendrick denied joint and muscle pain, as well as back pain. (R. at 1266.) Kendrick reported she had received treatment from a chiropractor and it "did wonders." (R. at 664.) She also reported physical therapy and acupuncture relieved her symptoms. (R. at 604, 1062, 1117, 1130.)

The ALJ found the opinions of the state agency physicians "persuasive." (R. at 30.) Both state agency physicians found Kendrick could perform light work that did not require more than occasional climbing, stooping, kneeling, crouching and crawling and that allowed her to avoid concentrated exposure to extreme cold temperatures, vibrations, machinery and heights. (R. at 114-15, 131-32.) While the state agency physicians did not place restrictions on Kendrick's ability to reach and to manipulate objects, the ALJ acknowledged Kendrick had a diagnosis of mild carpal tunnel syndrome, and he limited her to frequent overhead reaching and frequent handling with the right hand. (R. at 21, 30.)

The ALJ found Fields's November 2019 opinion "not persuasive" because it was inconsistent with the record. (R. at 33.) The ALJ noted Fields saw Kendrick on one occasion and did not have the opportunity to see her on a regular basis. (R. at 33.) Fields found Kendrick was pleasant and cooperative; she made adequate eye contact; she had an anxious mood and congruent affect; her stream of thought was disorganized; her judgment was impaired; her immediate memory was within normal limits, but her recent recall was impaired; and her pace and posture were within normal limits. (R. at 1176-77.) Based on this, Fields opined Kendrick had a seriously limited ability to make occupational, performance and personal/social adjustments, particularly in her ability to interact with others, to deal with work stresses and to maintain attention and concentration. (R. at 1180-81.) However, the record shows Kendrick regularly had normal behavior, thought content, memory, speech and concentration; her thought process was organized; and she had good insight and judgment. (R. at 330, 605, 607, 609-11, 614-15, 618, 620, 648-49, 652, 654, 661-62, 664-71, 676, 691, 693, 695, 995-96, 1068, 1116-17, 1131, 1159, 1171, 1292.) In addition, Kendrick reported on numerous occasions that medication and counseling improved her symptoms of anxiety and depression. (R. at 604, 606, 608, 618, 620, 622, 653, 694, 1021, 1167.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ found the state agency psychologists' opinions "persuasive." (R. at 32-33.) The state agency psychologists found Kendrick could perform simple, routine work with limited contact with the public. (R. at 118, 135.) The ALJ noted Kendrick's situation in the prison system caused social difficulties under an anxious work environment; thus, he accommodated her social sensitivity with a limitation to occasional, superficial interactions with co-workers and the public and occasional

interactions with supervisors. (R. at 32.) As noted by the ALJ, Kendrick performed a range of daily activities, including performing self-care, household chores and yard work; watching television; attending church weekly; teaching an adolescent Sunday school class; shopping in stores; and caring for her grandchildren and for a woman with health issues. (R. at 32, 1065, 1176.) In addition, Kendrick also stated she was trying to be more active by helping her neighbors with their transportation needs. (R. at 1208.)

The ALJ also noted Kendrick had sone sensitivity to general stress and accounted for these limitations by limiting her to simple, routine work. (R. at 32.) The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a) (2020); *Menkes v. Astrue,* 262 F. App'x 410, 412 (3d Cir. 2008) ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration."). Unskilled work is generally low stress and involves remembering only very short and simple instructions in a routine environment in which "concentration is not critical." Program Operations Manual System, ("POMS"), DI 25020.010(B)(3), available at secure.ssa.gov/poms.nsf/lnx/0425020010 (effective Apr. 5, 2007) (explaining that unskilled work involves "remember[ing] very short and simple instructions," and that "concentration is not critical"). Based on the above, I find substantial evidence exists to support the ALJ's consideration of the evidence.

Kendrick also argues the ALJ erred by finding a substantial number of jobs existed that she could perform. (Plaintiff's Brief at 7.) The ALJ posed a hypothetical question to the vocational expert which encompassed the ALJ's ultimate residual functional capacity finding. (R. at 21, 98-99.) The vocational expert testified that

such an individual could perform jobs existing in significant numbers in the national economy. (R. at 99-100.) It is well-settled that the testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his opinion is based on a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly set out all a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The vocational expert identified the job of bagger as having 6,700 jobs nationally. (R. at 100.) The Fourth Circuit has suggested in dicta that 110 jobs in the local economy would not constitute an insignificant number of jobs. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979); *see also Hodges v. Apfel*, 2000 WL 121251, at *1 (4th Cir. Jan. 28, 2000) (holding that 153 regional jobs "suffice[d] to defeat [the claimant's] claim for disability benefits"). Consistent with this, district courts within the Fourth Circuit have indicated that as few as 3,000 jobs in the national economy could qualify as significant. *See Aquino-Hernandez v. Saul*, 2020 WL 4678823, at *5 (D. S.C. Mar. 11, 2020) (finding 3,000 jobs to qualify as a significant number of jobs in the national economy). Thus, I find that the ALJ's finding that Kendrick could perform a significant number of jobs is supported by substantial evidence.

Based on this, I find that substantial evidence exists to support the ALJ's consideration of the opinion evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding;

3. Substantial evidence exists to support the ALJ's finding that a significant number of jobs existed that Kendrick could perform; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Kendrick was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Kendrick's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     January 10, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE